## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 19 2019, 9:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Raymond P. Dudlo
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

K.R. (Minor Child),

and

K.J. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 19, 2019

Court of Appeals Case No.
18A-JT-1766

Appeal from the Posey Circuit Court

The Honorable James M. Redwine, Judge

Trial Court Cause No.
65C01-1709-JT-218

**Tavitas, Judge.**

## Case Summary

[1] K.J. ("Mother") appeals the termination of her parental rights to her child, K.R.[1] We affirm.

## Issue

[2] Mother raises two issues, which we restate as a single issue of whether the evidence is sufficient to terminate Mother's parental rights.

## Facts

[3] Mother and R.J. ("Stepfather") live in Mt. Vernon, Indiana. Mother has three children from a previous relationship: fifteen-year-old T.R., twelve-year-old K.R. ("the Child"), and eleven-year-old S.R. Mother and Stepfather also have a child together, four-year-old D.J.[2]

[4] In December 2015, the three older children were upstairs when a fire broke out in a closet. At that point, Mother and Stepfather discovered that sexual abuse was occurring among the three children on the second floor of the home in the children's bedrooms. The Child was both an initiator and victim of sexual abuse. T.R., the Child's older brother, was sexually abusing the Child. Both T.R. and the Child were sexually abusing S.R. The Child and T.R. were

---

[1] The underlying proceeding and appeal only consider Mother's parental rights, and not the rights of Stepfather or the Child's biological father.

[2] This appeal only concerns Mother's parental rights to this Child. Mother's parental rights as to other children have not yet been determined.

removed from Mother's home on December 31, 2015. S.R. and D.J. remained with Mother and Stepfather initially, but later were removed.[3]

[5] The Posey County Department of Child Services ("DCS") filed a petition alleging that the Child was a child in need of services ("CHINS") on January 5, 2016. After a hearing in May 2016, Mother and Stepfather stipulated to the underlying evidence, and the trial court concluded the Child and the other children were CHINS. On July 11, 2016, the trial court held a dispositional hearing and issued its dispositional decree order granting wardship of the Child to DCS. As a result of the dispositional decree, Mother was required to, among other things: (1) participate in programs recommended by DCS; (2) participate in DCS services; (3) maintain suitable housing; (4) assist in the formation of a protection plan for the children; (5) participate in home-based counseling; and (6) participate in random drug and alcohol screens.

[6] After the children were adjudicated CHINS, and before the termination hearing, Stepfather was arrested and charged with domestic battery, strangulation, and criminal confinement on June 28, 2017.[4] Stepfather pleaded guilty to domestic battery of Mother. Stepfather also violated his probation

---

[3] The family case manager testified that, with regard to S.R., DCS removed S.R. in June 2017 "[d]ue to lack of follow through of [Mother] and [Stepfather] for the counseling and [S.R.'s] medication, and just, other concerns the Department had . . .". Tr. Vol. III p. 113. Mother also made statements to the family case manager that "[Mother] didn't feel comfortable with [S.R.] in the home and asked to have her removed." *Id.*

[4] The domestic incident involved Stepfather striking Mother in her face and placing his hands around her throat while D.J. was in Stepfather's arms.

from a 2010 burglary conviction. Stepfather remained incarcerated until January 12, 2018.

[7] At the time of the fact-finding hearing, Stepfather was unemployed. Mother is also unemployed and receives $750 each month for disability. The rent for the home is $650, and the family is often behind on bills for other expenses. The family does not have a working vehicle or reliable transportation.

[8] Mother testified that her medical issues include back pain, thyroid disease, diabetes, diabetic nerve pain, fibromyalgia, and arthritis. Mother testified that her medical issues cause her pain in her entire body. Mother's medical issues have also resulted in hospital visits.

[9] Prior to the filing of this petition to terminate parental rights, Mother's participation in court ordered services was inconsistent. Mother missed or was late to many appointments, especially in the month of August 2017. Danielle Mayes, the family's homebased caseworker at Ireland Home Based Services ("Ireland"), noted that Mother attended approximately ninety percent of the individual visits with the children until August 2017. Beginning in August 2017, however, Mother's attendance began to decline. Specifically, in August 2017, there were at least two cancelled visits and two no-call-ahead visits. After August 2017, Mother's attendance at visits improved. Progress reports also indicated that Mother did not participate in several services "due to health and transportation issues." DCS Ex. Vol. VII p. 46.

[10]    During Mother's visits with the children, Mayes observed that the Child would interact more with his siblings rather than with Mother. On one family visit, Mayes recalled an instance where D.J. was "crying and melting down." Tr. Vol. II p. 94. When Mayes tried to step in to assist Mother, Mother refused Mayes' assistance. Eventually, D.J. began choking from crying so hard that Mayes contacted her supervisor. At that point, Mother began "cussing [Mayes] out." *Id.* at 94. The visit was promptly ended. Additionally, in an individual visit with the Child on November 26, 2017, Mother told the Child, while they were playing cards, that if the Child cheated during the game, Mother was "going to whoop [the Child's] butt." *Id.* at 96. The Child then "shut[]down." *Id.* Mother also told the children that they were "coming home soon," when she had no basis to say so.[5] *Id.* at 98.

[11]    Subsequently, DCS filed a petition to terminate Mother's parental rights. The trial court held a fact-finding hearing on January 29, January 30, February 8, February 13, and April 20, 2018. Michelle McBeath, a therapist with Ireland, is the Child's home-based therapist and testified regarding the Child's extensive therapy. McBeath testified that, when Mother would cancel a visit, the Child would become angry. Child also expressed to McBeath that he wanted to be adopted by Foster Mother. According to McBeath, the Child smiles when he discusses adoption; he discusses that he feels safe with Foster Mother and that he would like to change his last name to the same as Foster Mother's last name.

---

[5] At the time of the termination proceedings, K.R. and Mother were not having individual visits.

Furthermore, the Child told McBeath that he considers himself part of Foster Mother's family and considers Foster Mother's son to be his brother.

[12] The Child indicated that he does not feel safe at Mother's home. When asked why the Child did not feel safe in Mother's home, McBeath testified:

> [The Child] had discussed concerns about feeling unsafe, and, he had discussed concerns about feeling unsure and unsafe with [S.R.] in the home. He had mentioned before in a session concerns about what the sexual abuse, basically, taking place again. Concerns about [S.R.] and concerns about himself. He had also reported to me concerns about [Mother] not being able to watch them, because she was ill.

*Id.* at 162.

[13] McBeath testified that the plan is for the Child to continue therapy to work on boundary issues. McBeath believes the Child still struggles with certain boundary issues, specifically with S.R. McBeath testified that she is not concerned about the Child's presence around other children in foster placement.

[14] DCS also recommended that the Child be adopted. Kara Wolf was the DCS family case manager for all four children throughout the CHINS proceeding, beginning in April 2016. Wolf testified that the Child bonded with his foster family and began calling Foster Mother "Momma." Tr. Vol. III p. 118. Wolf testified that:

Overall, after two (2) years of working with the family, [Mother and Stepfather] really have not been consistent in taking care of the needs of the children. And when it comes right down to it, I don't feel that [the Child and S.R.], that (sic) it would be in their best interest for them to live in the same home. Just based on the trauma that they've experienced. When we talked about putting [the Child] home last year, both [S.R. and the Child] started to display some negative behaviors.

*Id.* at 119.

[15] Erin Berger, the guardian ad litem ("GAL") for the Child, recalled a conversation with Mother in May or June 2017, where Mother expressed "concerns about ever having [the Child] and [T.R.] returned to her care." *Id.* at 97. Berger testified as follows:

Up and until this point, the things that were presented recently between [S.R.] and her therapist caused me grave concerns that these children cannot ever be placed back in a household together. And because of that, and because of [the Child's] feelings of what he wants to happen, I think it would be, I think [the Child's] well-being is at risk if he were to be placed back in the household. I think [the Child's] placement right now is absolutely his best chance to have a normal, loving, familial relationship. I think it's his best opportunity to have a healthy and productive future. And I think if we were to damage that placement in anyway, I don't think that would be in [the Child's] best interest. I think adoption at this point, by his placement, is his very best chance for his future.

*Id.* at 99.

[16] In one meeting between Mother, Stepfather, and DCS, Stepfather told DCS that he did not believe he and Mother could supervise the Child at home and that Mother and Stepfather did not want the Child back at home. Mother did not disagree with Stepfather when he made these statements.

[17] The Child has lived with Foster Mother for approximately two years. Foster Mother is not employed; she is disabled. There are several others living at Foster Mother's house, including Foster Mother's sister, Foster Mother's son, and another foster child. Foster Mother testified that, if given the opportunity, she wants to adopt the Child. Foster Mother also stated that the Child asked Foster Mother to adopt him. Foster Mother has demonstrated that she is able to meet the Child's needs. She regularly drives the Child to his therapy appointments and to football practice. She testified that her health does not interfere with her care of the Child.

[18] Sherri Wilson, a home-based therapist at Ireland who worked with Mother in 2016, also testified that she had to shorten a visit when an argument erupted between the Child and D.J, while Mother and Stepfather were arguing. Wilson asked Mother and Stepfather to turn their attention to the children, which they did for a short time, but they then continued to accelerate the argument between themselves. The Child became upset and left the house when this occurred. Stepfather also told the case manager about an instance where he attempted to pump Mother's stomach after he believed Mother had taken too much medication. Stepfather testified that, after Mother drank orange juice, she was better.

[19]     Additionally, testimony was elicited regarding Mother's relationship with S.R. as well. S.R. had a medical issue which resulted in her soiling herself multiple times during the day and throughout the night. Mayes helped S.R. clean her room and found several soiled clothes and pads all over the room and underneath S.R.'s bed. In March 2017, Mayes assisted S.R. in picking out new bedding and paint for her bedroom to change S.R.'s environment to better manage the trauma; however, Mother and Stepfather did not make changes to the bedroom until June 2017. Sara Burns, a home-based therapist and supervisor at Ireland, served as S.R.'s counselor. S.R.'s therapy focused on "trauma focused cognitive behavioral therapy." Tr. Vol. II p. 175. During a session, S.R. reported to Burns that S.R. did "not feel[] like there was a lot of supervision upstairs or checking in on her." *Id.* at 177.

[20]     During a child and family team meeting, Burns recalled some discussion where Mother made comments regarding S.R.'s behavior at home, and specifically, that S.R. was "prancing or something around the house naked in front of the boys." *Id.* at 196. Burns objected to Mother's comments, stating that Mother should not be blaming S.R. Mother also made comments to S.R. that "affect[ed S.R.'s] disposition." *Id.* at 96. Specifically, in November 2017, Mother told S.R. that she "smelled like urine" and that she was "lying to placement" about having accidents. *Id.* Mother also neglected to pick up S.R.'s medication for over a month.

On June 28, 2018, the trial court issued an order with findings of fact and conclusions of law, terminating Mother's parental rights to the Child. The trial court's relevant findings and conclusions included:

\* \* \* \* \*

> [On] December 31, 2015, the DCS became involved in [the Child's] life after the DCS received a report that S.R.[] had been the victim of sexual abuse[] from [the Child] and T.R. [The Child] resided with his Mother and [Stepfather] as well as S.R., his [younger] sister, T.R., his old brother, and D.J., his younger brother.

\* \* \* \* \*

> The sexual abuse occurred on the second floor of the children's home in their closets and bedrooms in private. The Mother and [Stepfather] were present in the home when the abuse occurred. The sexual abuse occurred for approximately two (2) years.

\* \* \* \* \*

> The Mother is physically impaired and has not worked during the case. The [Stepfather] has not had a job for years and only just recently became employed before the end of the termination trial. The Mother and [Stepfather] have been behind on rent and bills and often have to seek assistance to get necessities for themselves, and the children. They have not had a reliable means of transportation during the CHINS case. Mother has numerous health issues that impact her ability to function. . . . The Mother indicates that she feels constant pain. She describes the constant pain as being a six (6) on a scale of one (1) to ten (10). One being no pain and ten being the most pain imaginable. Throughout the case the Mother has missed numerous visits with

[the Child] due to her health issues. The Mother's missed visits have a negative impact on [the Child].

* * * * *

[The Child] has had extensive conversations with his therapist regarding possible adoption. The Child is nearly thirteen (13) years old. [The Child] has been placed with [Foster Mother] for over two (2) years. [The Child] expresses concerns about his mother's ability to supervise him if he were to return home. [The Child] wants to be adopted by [Foster Mother].

* * * * *

[The Child] will need ongoing therapy and heightened supervision for the foreseeable future. [The Child] still has issues from time to time with boundaries.

* * * * *

But based on the failure of the Mother and [Stepfather] in May and June of 2017, it is clear that the plan of reuniting D.J., S.R., and [the Child] all with the Mother is beyond what the Mother and [Stepfather] are capable [of] and is not in any of the children's best interest.

* * * * *

[The Child] expresses fear that the Mother will not be able to supervise him due to her illness. Indeed, the concerns that the children have are supported by the evidence and appear to be well founded. The disclosures made by the children at the beginning of the case regarding the extent and duration of the sexual abuse between the siblings and the fact that the abuse

went on for two (2) years without the Mother and [Stepfather] being able to realize, speaks to the lack of supervision in the home prior to DCS involvement. Based on the Mother's ongoing illness and frailty, the reoccurring domestic violence issues between the Mother and the [Stepfather], and the significant needs of [the Child] based on his experiences as a victim and perpetrator of sexual abuse [the Child] cannot be returned to his Mother's care in spite of numerous and extensive services provided by DCS.

* * * * *

There is a reasonable probability that the conditions that resulted in the Child's removal from, or continued placement outside the care and custody of the Mother will not be remedied.

There is a reasonable probability that the continuation of the parent-child relationship between the Mother and the child poses a threat to the Child's well-being.

Appellant's App. Vol. II pp. 3-7. The remaining children are still in wardship with DCS.

## Analysis

[22] Mother challenges the termination of her parental relationship with the Child. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e]

[c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities by failing to provide for the child's immediate and long-term needs.'" *K.T.K.,* 989 N.E.2d at 1230 (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[23] When reviewing the termination of parental rights, we neither reweigh the evidence nor judge witness credibility. *In re C.G.,* 954 N.E.2d 910, 923 (Ind. 2011). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)).

[24] Pursuant to Indiana Code Section 31-35-2-8(c): "The trial court shall enter findings of fact that support the entry of the conclusions required by subsections (a) and (b)" when granting a petition to terminate parental rights.[6] Here, the

---

[6] Indiana Code Sections 31-35-2-8(a) and (b), governing termination of a parent-child relationship involving a delinquent child or CHINS, provide as follows:

> (a) Except as provided in section 4.5(d) of this chapter, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship.

trial court did enter findings of fact and conclusions of law in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions of law entered in a case involving the termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[25]    Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, and DCS must prove by clear and convincing evidence, in part:

* * * * *

(B) that one (1) of the following is true:

(i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

---

(b)  If the court does not find that the allegations in the petition are true, the court shall dismiss the petition.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

*See In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship."

[26]    Although Mother attempts to frame her appeal as spanning several issues, her arguments boil down to her claim that insufficient evidence was submitted that either: (1) the conditions that resulted in the Child's removal will not be remedied; or (2) the continuation of the parent-child relationship poses a threat to the Child's well-being.[7] Mother specifically argues that the evidence was not sufficient to meet one of these two findings because: (a) the findings regarding Mother's medical issues were misleading; (b) the findings regarding Mother's

---

[7] Mother's brief implies that both findings must have been established, but the statute requires proof of only one of the two. *See* Ind. Code § 31-35-2-4(b)(2)(B).

financial status were misleading; (c) Mother is at least no worse than Foster Mother, who is the pre-adoptive parent; and (d) because the other children are not in the home, the Child's return to the home would not be problematic because the sexual abuse would not occur without the other children in the home.

[27] "In determining whether 'the conditions that resulted in the [Child's] removal . . . will not be remedied,' we 'engage in a two-step analysis.'" *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "First, we identify the conditions that led to removal; and second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* In analyzing this second step, the trial court judges the parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.* (quoting *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005)). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[28] The trial court concluded that there were many reasons that the conditions in the home were unlikely to be remedied. Specifically, the trial court stated:

> The disclosures made by the children at the beginning of the case regarding the extent and duration of the sexual abuse between

the siblings and the fact that the abuse went on for two (2) years without the Mother and [Stepfather] being able to realize, speaks to the lack of supervision in the home prior to DCS involvement. Based on the Mother's ongoing illness and frailty, the reoccurring domestic violence issues between the Mother and the [Stepfather], and the significant needs of [the Child] based on his experiences as a victim and perpetrator of sexual abuse [the Child] cannot be returned to his Mother's care in spite of numerous and extensive services provided by DCS.

Appellant's App. Vol. II p. 28.

[29] The trial court's findings were supported by sufficient evidence that there is a reasonable probability that the conditions that resulted in removal will not be remedied. The Child and his siblings were removed from Mother's care after it was discovered that the Child and his siblings were participating in and/or were the victims of sexual abuse. The abuse was occurring on the second floor of the family home when Mother and Stepfather were home. Mother and Stepfather claim they became aware of the abuse when, in the course of an episode of sexual abuse, the children started a fire in an upstairs closet. The sexual abuse occurred for two years, and Mother clearly is incapable of supervising and parenting the Child if these incidents went unnoticed for two years.

[30] The evidence demonstrates that Mother's and Stepfather's supervision of the children was woefully deficient and is a significant consideration in determining whether the conditions of the home are likely to be remedied. Although all of the children may not be returned to the home, which would eliminate the threat of the exact abuse that was occurring prior to the children being adjudicated as

CHINS, it is clear that the primary reason for removal was Mother's and Stepfather's lack of supervision of the children, which allowed the children to participate in this conduct. Mother is unable to appreciate the children's needs, which include caring, active and consistent supervision.

[31] The evidence presented indicates that both Mother and Stepfather have expressed concerns about taking care of the children's needs at different times. Additionally, Mother's health issues interfere with supervision of the Child and with meeting the Child's needs. Specifically, Mother has been unable to attend court-ordered appointments due to pain or illness. Mother has been unable to pick up medication for the children or take the children to their appointments. The Child has several medications and regular appointments that would require Mother to regularly transport the Child to certain locations. Mother demonstrated her difficulty with this when she neglected to pick up S.R.'s medication for over a month. Mother's health has also caused delays in preparation of S.R.'s room for potential reunification.

[32] While Mother claims that her health does not interfere with her supervision of the children, Mother has failed to demonstrate that she is able to provide the Child with the resources he needs to overcome the trauma of the sexual abuse. The trial court properly noted that "[the Child] will need ongoing therapy and heightened supervision for the foreseeable future. [The Child] has issues from time to time with boundaries." Appellant's App. Vol. II p. 27. Mother has failed to meet the basic needs of the Child. She is not equipped to provide for the special needs of the Child due to the sexual abuse.

[33] Furthermore, the children, even in the course of therapy, have voiced their concerns and fear that Mother cannot properly supervise them. When Mother failed to show up for certain appointments, the Child would be disappointed and acted out accordingly. Even after the CHINS proceeding, DCS had to remove S.R. and D.J. due to Mother's inability to care for the children, and especially S.R. Mother's lack of supervision and inability to provide for the Child's heightened needs at this time in his life are detrimental to the Child.

[34] For purposes of this proceeding, the fact that Foster Mother also does not work due to disability is irrelevant. As the State correctly argues, this is a concern for the adoption court. The court's role at this time is to consider only whether there was sufficient evidence to conclude that the requirements of the parental termination statute were met, and not whether the Child's presumed alternative is better or worse than Mother. Still, we note that, in contrast to Mother, the Child has indicated that he feels safe at Foster Mother's home and is excited for adoption. Foster Mother has been taking the Child to his regular appointments and appears able to continue to do so. Foster Mother's disability has not prevented Foster Mother from meeting the needs of the Child.

[35] Finally, Mother's characterizations that the reasons for removal are misleading is incorrect. Sufficient evidence exists to support each of the statements in the trial court's order. Ultimately, the Child was removed from Mother's home due to his ongoing activity as a perpetrator and victim of sexual abuse, which occurred while Mother and Stepfather were at home. Mother failed to adequately supervise the Child then, and the evidence demonstrates that

Mother is not any better equipped to provide adequate supervision and support moving forward.

[36] For these reasons, we agree with the trial court that the conditions that resulted in the Child's removal are not likely to be remedied. We need not, therefore, consider separately whether the parent-child relationship poses a threat to the well-being of the Child; however, for the same reasons stated above, we find that the continuation of the parent-child relationship does pose a threat to the well-being of the Child.

## Conclusion

[37] Sufficient evidence was presented to support the termination of Mother's parental rights. Accordingly, we affirm.

[38] Affirmed.

Baker, J., and May, J., concur.